
# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
November 15, 2016 Session

## STATE OF TENNESSEE v. RODNEY LEE SCOTT

**Appeal from the Criminal Court for Knox County**
**No. 103494    Scott Green, Judge**

_____

### No. E2015-01772-CCA-R3-CD

_____

Defendant, Rodney Lee Scott, was found guilty by a jury of attempted voluntary manslaughter, aggravated assault, reckless aggravated assault, leaving the scene of the accident, and public intoxication as the result of an incident described as road rage on December 16, 2013. As a result of the convictions, Defendant received an effective sentence of six years. Defendant appeals, challenging: (1) the sufficiency of the evidence; (2) the denial of a motion to sever; (3) the denial of a motion in limine which sought to allow Defendant to cross-examine the victims about their criminal history; (4) his dual convictions for attempted voluntary manslaughter and aggravated assault; and (5) the trial court's denial of a mistrial. After a review of the evidence and authorities, we affirm the judgments of the trial court with respect to Defendant's convictions for attempted voluntary manslaughter, aggravated assault, leaving the scene of the accident, and public intoxication. Because reckless aggravated assault cannot be a lesser included offense of aggravated assault based upon fearing imminent bodily injury, we reverse and dismiss Defendant's conviction for reckless aggravated assault. On remand, the trial court should enter judgment forms dismissing Counts Four and Seven of the indictment.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part and Remanded

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

John M. Boucher, Jr. Knoxville, Tennessee, for the appellant, Rodney Lee Scott.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Charme P. Allen, District Attorney General; and Kevin Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual Background*

In April of 2014, Defendant was indicted by the Knox County Grand Jury for attempted first degree murder, aggravated assault, leaving the scene of an accident, public intoxication, and theft of property valued at $500 or less after incidents taking place on December 16, 2013. At around 3:42 p.m. that day, a call was made to 911 to report an ongoing "road rage" incident involving a black SUV and two motorcycles.

Shortly before the 911 call, J.R. Trisler and his friend Tyler Lakin met at Moto 4 Us motorcycle shop. The two had plans to ride motorcycles on Highway 95. Instead, the men rode their bikes on I-640 and exited at East Town Mall Road where the exit ramp splits from one lane into two lanes prior to the end of the ramp. Mr. Lakin was in front of Mr. Trisler by about "two bike lengths" on the ramp in the right lane. A black SUV was in front of Mr. Lakin, driven by Defendant. When the ramp split into two lanes, Mr. Lakin got into the left lane. Before the SUV got to the end of the ramp, "[Defendant] swerved to try to hit [Mr. Lakin]." Mr. Trisler saw the SUV swerve toward Mr. Lakin twice.

Defendant had been at the golf course that day but the weather prevented him from playing golf so he played a few rounds of cards with his friends instead. He was on the way home from the golf course when he realized that he needed to run an errand requiring him to turn left off the exit. He started to move his vehicle from the right lane over into the left lane when he changed his mind and decided to just go home. He then moved back into the right lane so that he could turn right and head toward his house. At that time, he heard motorcycles. As the motorcycles and Defendant approached the end of the ramp, the motorcycles were in the lane to the left of Defendant's SUV. Mr. Lakin "traded words" with Defendant at the end of the ramp and accused Defendant of running Mr. Trisler off the road. Defendant recalls that he asked the men something like, "What are you doing?" Defendant claimed that he did not know what Mr. Lakin was talking about but that he got "angry" nonetheless and the two men "had some choice words" between each other. Mr. Trisler recalled Defendant had his window down and "was screaming that he hated motorcyclists." Mr. Trisler heard Defendant "cussing" and using "racial slurs" like "N-----" and "yellow boy,"[1] so he decided to "get his tag number and call the cops." After the exchange at the end of the ramp, Defendant turned right and went toward his own house. Mr. Trisler described Defendant's actions as "hysterical."

---

[1] On cross-examination, Mr. Trisler admitted that in his initial statement to police, he only told police that Defendant was calling them names.

The motorcyclists followed Defendant down Millertown Pike. At one point, Defendant "hit the brakes real hard" and almost made Mr. Trisler "rear end" Defendant. Defendant started driving again and eventually pulled in to a Regions Bank parking lot. Defendant sped around the building in his SUV. Defendant did not stop because he thought the men on the motorcycles were "going to beat [him] up or do something like that." Mr. Trisler pulled into the bank parking lot, hopped off his bike, and screamed at Ben Bellew, the security guard, to call the police. Mr. Bellew had been standing inside near the tellers when he "heard the squalling tires come through" the parking lot. He walked outside, saw a black Saturn SUV and two motorcycles, and was told by Mr. Trisler to call 911.

Defendant drove his SUV back onto the main road and the motorcycles continued to follow him. After traveling down the road for a bit, Defendant stopped the SUV before he got to a stop sign and "put the brake - - reverse lights on and he backed up into [Mr. Trisler]." Mr. Trisler claimed Defendant's "car clipped [his motorcycle]" and he threw his motorcycle into the ditch to avoid a more serious accident. The bike sustained a small amount of damage. Thuan Mai, a nearby resident, was outside and heard a "quick stop from a vehicle" so he turned around just in time to see Defendant "put it in reverse" for one to two car lengths. The motorcycle behind the SUV tried to avoid the accident and went into the ditch "to avoid from getting hit." Mr. Mai helped Mr. Trisler get his bike back up on to the roadway. Mr. Mai observed minor damage to the motorcycle.

Defendant testified the incident at the stop sign was the result of a traffic back up where he thought "there was enough room to where [he] could probably get out of there" so he "backed up" in order to try to drive forward around other cars and evade the motorcycles. Defendant stated, "[N]ext thing I knew, one of [the motorcycle riders] is on the hood of my car. [The motorcycle rider] grabbed my mirror and he grabbed the area right where my windshield wipers are, and beat the windshield, and sa[id], 'I'm going to kill you, you son of a bitch.'"[2] Defendant described backing up as a defensive move and admitted leaving the scene. Defendant testified he drove as fast as possible to get home, though the volume of traffic made it difficult.

At a red light, Mr. Trisler yelled for someone to call 911. Joe Jackson was stopped nearby and overheard this request. He placed a call to 911 at around 3:42 p.m. During the phone call, Mr. Jackson reported that a black Saturn Vue just hit a motorcycle and was trying to leave the scene. He reported the location of the incident and the license plate number of the SUV. Mr. Jackson saw two motorcycles following the SUV. He decided to follow both the motorcycles and the SUV. Eventually they turned onto Mary

---

[2] The State called Mr. Mai in surrebuttal. Mr. Mai testified that the driver of the motorcycle never touched Defendant's vehicle.

Emily Lane where the SUV pulled into a driveway. Defendant exited the vehicle and walked into the house.

Defendant came out of his house shortly thereafter. Mr. Trisler informed Defendant that someone had already called the police, but Defendant was "screaming and he had some guns in his hands." Mr. Jackson saw the guns, put his car in gear, and retreated toward the dead end of the street. Mr. Jackson was able to witness the events by turning partially around in the driver's seat while he was driving away. Defendant continued to walk toward Mr. Trisler and Mr. Lakin. As Defendant approached, Mr. Trisler walked backward and diagonally away from Defendant. At first, Mr. Lakin thought Defendant was "just trying to intimidate [them], . . . so [he] didn't run." Mr. Lakin put his hands up in the air. Mr. Lakin recalled turning to walk away around the time Defendant started shooting. Mr. Trisler heard two or three shots. Mr. Lakin did not immediately fall to the ground, and actually thought Defendant had "shot over [him]" in order to intimidate him. Mr. Trisler turned and started to run away when he heard the shots. When he turned back around, Mr. Lakin was "l[]ying face down . . . in the street." Mr. Trisler saw Defendant fire the first two shots and thought that they were fired "straight at [Mr. Lakin's] face." The second two shots were fired "in the back" as Mr. Lakin was lying on the ground.[3] Mr. Trisler heard Defendant yelling "racial slurs." "After he shot [Mr. Lakin] two more times in the back, [Defendant] kept putting a gun to [Mr. Lakin's] head and pulling the trigger." Defendant stated that he would "kill" the "mother f'er." When the shooting was over, Defendant walked back inside. Defendant exited the house moments later, drinking a soda. Mr. Trisler called 911.[4] Mr. Trisler asked Defendant why he shot Mr. Lakin. Defendant informed him that it was "self-defense."

Mr. Jackson called 911 for a second time at 3:48 p.m. to report the shooting. A review of the recording clearly indicates that Mr. Jackson was obviously distressed by the situation and was struggling to breathe. He reported that "this guy just come out and shot this man" seven or eight times from "point blank" range. He described the shooter as an "older white guy" who shot the victim in the back. Several other neighbors heard shots fired and called 911.

Mr. Lakin was shot one time in the hand, one time in the "lower spine area," one time in the "upper spine area" and one time on the "right side of [his] back, about mid - -

---

[3] Again, on cross-examination, counsel for Defendant pointed out that the initial statement from Mr. Trisler did not include information about Defendant shooting Mr. Lakin in the back.

[4] During the lengthy 911 call, Mr. Trisler exclaims that "this guy just shot my friend in the street" after he "tried to take us out on the interstate." On the tape of the call, you can hear Mr. Trisler arguing with someone, presumably Defendant, but it is not clear who is talking.

mid way." He spent about one week in the hospital. The bullets were not removed from his body.

Joan Scott, Defendant's wife, was home when Defendant, Mr. Lakin, and Mr. Trisler arrived that afternoon. Mrs. Scott is legally blind as a result of macular degeneration. Defendant had been at the golf course, a place he went regularly to play golf or cards. Defendant came into the house, shoved her out of the way, and told her to stay inside. She testified at trial that she heard Mr. Trisler and Mr. Lakin call her an "old bitch" and threaten her so she called 911, "hysterical and terrified" that she "was going to be killed" by the motorcyclists.[5] She heard Defendant yelling at them but could not see what they looked like because they were both wearing helmets. Additionally, she remained inside and the three men were outside. Mrs. Scott did not think Defendant was drinking the day of the incident.

Defendant described himself as "aggravated" when he pulled into his driveway because some of the things in his car spilled all over the place "during . . . the melee." He opened the car door to clean out the mess and heard motorcycles. Defendant claimed that he did not call 911 while he was driving because he could not see the phone well enough to dial without his reading glasses.

Defendant entered the house and instructed his wife to call 911. Defendant went upstairs to retrieve a pistol thinking that when he went outside with the pistol that the men would leave. Defendant walked outside and fired the gun in the air. The men were screaming obscenities at him. There were "a lot of verbal MF's, both of us, [and] SOB's." Defendant claimed that he was afraid and that the men threatened both him and his wife. Defendant walked toward the men and told them to "go ahead and leave." Defendant insisted his "gun was down" at that time when Mr. Lakin's arm reached and came up toward him. Defendant fired and the pistol went "bam, bam, bam, bam, bam as [Mr. Lakin] went down." Defendant had "never fired a pistol before in [his] life" and did not want to kill anyone.

The first officer on the scene was Detective Heather Rayda with Knox County Sheriff's Office Major Crimes Unit, who was on her way to work and received a "BOLO"[6] for a "possible road rage incident." While she was driving, the matter evolved into a report of a shooting and changed from city to county jurisdiction. When she arrived on Mary Emily Lane, she observed "a man l[]ying face down in the grass," Defendant "to [her] left standing in a driveway," and a third person in her "peripheral

---

[5] Mrs. Scott admitted that she did not tell officers on the scene that the victims threatened her that day.

[6] BOLO is an acronym used in law enforcement meaning "be on the lookout."

vision on the right." She exited her unmarked patrol car, and Defendant "raise[d] his hands." Detective Rayda patted him down and placed him in handcuffs.

Mr. Lakin was "struggling to breathe." Once Defendant was handcuffed, Mr. Trisler came out from where he was seeking refuge. He and the victim were still clothed in motorcycle gear. Detective Rayda described Defendant as "intoxicated" with "bloodshot and red" eyes and noticed that he smelled of alcohol. He acted "calm" and "aloof." Detective Rayda described his speech as "a little bit slurred." Mr. Trisler and Mr. Lakin were both "extremely upset" and seemed "petrified."

The scene was processed by Kimberly Trotter of the Knox County Sheriff's Department Crime Scene Unit. She recovered eight spent shell casings from a .25 caliber gun outside, and a "small .25 caliber Beretta handgun" from the garage of Defendant's residence. Officers also found a bottle of Fireball whisky in Defendant's golf bag. A toxicology test administered five hours after the incident showed Defendant had a blood alcohol content of .04.

At the conclusion of the trial, Defendant was convicted of attempted voluntary manslaughter, aggravated assault, reckless aggravated assault, leaving the scene of an accident, and public intoxication.[7] Defendant was found not guilty of attempted first degree murder with respect to Mr. Trisler.

At the sentencing hearing, the trial court sentenced Defendant to an effective sentence of six years. The trial court ordered Defendant to serve one year in the Knox County Jail day for day prior to being placed on probation. The trial court also ordered a mental health evaluation to include anger management.

Defendant filed a timely motion for new trial. Among other things, he argued that: (1) the evidence was insufficient; (2) the trial court erred in denying the motion to sever; (3) the trial court erred in denying the motion in limine; (4) the trial court improperly instructed the jury; (5) the trial court erred in denying a mistrial; (6) the trial court erred by refusing to exclude the testimony of the victims after they violated the rule of sequestration; (7) the trial court erred by failing to give a curative instruction after the victims violated the rule of sequestration; (8) the trial court erred by refusing to hold the victims in contempt; and (9) the verdicts are inconsistent. After a hearing, the trial court denied the motion. Defendant appealed.

---

[7] The technical record indicates that the theft count was severed from the remainder of the offenses and ultimately dismissed. The record does not contain a judgment form disposing of this count of the indictment. On remand, the trial court should enter a judgment form dismissing the theft count. *See State v. Lemaricus Devall Davidson*, ___ S.W.3d ___, No. E2013-00394-SC-DDT-DD, 2016 WL 7339116, at *41 (Tenn. Dec. 19, 2016) (requiring a trial court to prepare a uniform judgment document for each count of the indictment).

*Analysis*

At the outset, we are compelled to note that the record on appeal does not contain a transcript from the hearing on the motions in limine, the motion to sever, or on the motion for new trial. At oral argument, counsel for Defendant was given ten days to supplement the record. The appellant has the duty to prepare a record sufficient to allow meaningful review. Tenn. R. App. P. 24(b) (mandating that "the appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal"); *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). Accordingly, the absence of the transcript of a hearing generally constitutes waiver of the issue. *Thompson v. State*, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997); *Ballard*, 855 S.W.2d at 560-61 ("Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue."). Defendant was given ample time to supplement the record at oral argument in this Court and has failed to do so.

*Denial of Motion to Sever*

Defendant complains that the trial court failed to sever the public intoxication charge because it was of evidentiary relevance. The State argues that Defendant waived this claim because he failed to provide an adequate record for review. The record on appeal does not include a transcript of the hearing on the motion to sever. Tenn. R. App. P. 24(b); *Ballard*, 855 S.W.2d at 560. Defendant does not address this deficiency in the record. This issue is waived. *Thompson*, 958 S.W.2d at 172; *Ballard*, 855 S.W.2d at 560-61.

*Denial of Motion in Limine*

Defendant argues that he should have been allowed to cross-examine the victims about their criminal histories. Specifically, Defendant insists that because he was relying on the affirmative defense of self-defense, the victims' histories of "violent, assaultive [behavior], reckless driving, and drug use" were relevant. Additionally, he contends that "a material issue exists beyond the character trait for being violent," there is clear and convincing proof that the victims had a prior criminal history, and the probative value is not outweighed by the danger of unfair prejudice.

Just prior to empanelling the jury, the trial court admonished counsel that "[n]either side is to get into anything outside of what transpired with this event without first approaching the bench and getting this Court's permission to go into it. . . . And that

includes any misdemeanor convictions that these two motorcyclists may have, that includes any potential prior bad act either [Defendant] or one of them have." The trial court instructed the parties to "approach the bench and ask" before delving in to such matters. From our review of the record, we were unable to locate any attempt by Defendant to cross-examine the victims about their prior conduct during trial.

Again, there is no transcript of the hearing on the motion in limine in the record on appeal, and Defendant does not address this inadequacy in his brief. Tenn. R. App. P. 24(b); *Ballard*, 855 S.W.2d at 560. Moreover, Defendant has not made any attempt to supplement the record. This issue is waived. *Thompson*, 958 S.W.2d at 172; *Ballard*, 855 S.W.2d at 560-61.

*Denial of a Mistrial*

Defendant argues on appeal that the trial court should have granted a mistrial or excluded the testimony of the victims on the basis that they violated the rule of sequestration. The State counters that the trial court properly allowed Defendant to cross-examine Mr. Lakin about violating the rule of sequestration and Defendant failed to show he was prejudiced by the victims' conversation.

At trial, Mr. Trisler testified before Mr. Lakin. Mr. Lakin was not in the courtroom at the time of his testimony because the rule of sequestration had been requested. After the direct testimony of Mr. Lakin but prior to his cross-examination, the trial court admonished the witnesses regarding the rule of sequestration. When court adjourned for lunch, Greg Lundy, an investigator for Defendant walked out of the courtroom behind Mr. Lakin and Mr. Trisler. As they walked toward a restaurant, Mr. Lundy heard a full discussion between Mr. Trisler and Mr. Lakin about their testimony. Counsel for Defendant asked the trial court to examine the witnesses and exclude the testimony.

In a jury out hearing, the trial court examined Greg Lundy, the investigator for Defendant. Mr. Lundy saw the witnesses leaving together and heard them discussing the case, the "type of questions that [they] were asked" and generally "comparing notes" about their testimony. Mr. Lundy actually recorded their conversation but the trial court declined to listen to the recording.

Mr. Lakin was questioned by the trial court and cross-examined by counsel for Defendant and admitted that he "discuss[ed] the details of the day" and made "comments about the lawyer" but did not "specifically talk[] about situations that happened in this courtroom." The court decided not to strike the testimony or grant a mistrial but again admonished the witness about discussing his testimony while the trial was ongoing.

- 8 -

Defendant moved for a mistrial as soon as court reconvened after lunch. After the trial court denied the mistrial, Defendant raised the mistrial issue in his motion for new trial and raised the issue again on appeal. However, we must determine whether the absence of the transcript of the motion for new trial hearing hinders our review of whether the trial court erred with respect to the denial of a mistrial.

A trial court has the authority to declare a mistrial, and its decision is reviewed for an abuse of discretion. *See State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239 (Tenn. 2003). A mistrial is appropriate when "a trial cannot continue, or a miscarriage of justice would result if it did." *Id.* (internal quotation omitted). A manifest necessity exists when something has occurred that would prevent an impartial verdict, *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000), and there is "no feasible alternative to halting the proceedings," *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). The burden is on the party seeking the mistrial to show that a manifest necessity exists. *Land*, 34 S.W.3d at 527. "'[N]o abstract formula should be mechanically applied and all circumstances should be taken into account.'" *Nash*, 294 S.W.3d at 546 (quoting *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993)).

In response to the State's assertion that this issue is waived, we conclude that the evidence provided in the record is sufficient "to convey a fair, accurate and complete account of what transpired with respect to those issues which are the bases of appeal." Tenn. R. App. P. 24(b). The record contains the transcript of the trial including the questioning of the witnesses about the violation of the rule; this is the entirety of what was before the trial court when the trial court made its decision to deny a mistrial. Accordingly, we conclude that the record before us "provides a sufficient amount of information to determine" whether the trial court abused its discretion in declining to grant a mistrial. *State v. Taylor*, 992 S.W.2d 941, 944 (Tenn. 1999).

Defendant argues that the sequestration rule was violated. That rule provides: "At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing . . . The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness." Tenn. R. Evid. 615. The sequestration rule is designed to prevent witnesses from hearing the testimony of other witnesses and subsequently adjusting their testimony. *State v. Harris*, 839 S.W.2d 54, 68 (Tenn. 1992). In fashioning a remedy for a violation, a trial court can instruct the jury about the witness's violation, exclude the witness from testifying, or even allow a defendant to cross-examine a witness about the violation. *See State v. Jordon*, 325 S.W.3d 1, 42 (Tenn. 2010); *State v. Anthony*, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Of course, more drastic measures, such as a mistrial, are reserved for egregious cases involving "intentional violations" of the rule. *Jordan*, 325 S.W.3d at 41. When a sequestration rule violation is

raised on appeal, this Court shall consider the seriousness of the violation and the prejudice, if any, suffered by the defendant. *Harris*, 839 S.W.2d at 68-69.

In this case, the trial court recognized the violation occurred and questioned the witnesses. The violation occurred after the testimony of Mr. Trisler and at the conclusion of the direct examination of Mr. Lakin. The investigator that overheard the conversation testified that the men discussed why they were traveling to Highway 95 and the performance of the trial attorneys. Defendant was given the opportunity to cross-examine the witnesses in the jury-out hearing. Defendant has failed to show the witnesses' conversation resulted in prejudice. This issue is without merit.

*Sufficiency of the Evidence*

In a rather blanket argument lacking in specificity, Defendant argues that there was no evidence presented by the State to negate self-defense, defense of another, necessity, or duress. Defendant makes no challenge with regard to the State's failure to prove the essential elements of each offense but argues that the evidence is insufficient to support his convictions. The State insists that the jury heard sufficient evidence to sustain the convictions.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *Wagner*, 382 S.W.3d at 297 (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id*. The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

After hearing the evidence from the State and Defendant, the trial court instructed the jury with respect to the elements of the offenses as well as the affirmative defenses raised by Defendant: self-defense, defense of another, and duress.

### A. Attempted Voluntary Manslaughter

Defendant was indicted for attempted first degree murder and the jury returned a guilty verdict on the lesser included offense of attempted voluntary manslaughter. Attempted voluntary manslaughter is an attempt to knowingly or intentionally kill another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner. T.C.A. § 39-12-101; T.C.A. § 39-13-211(a). A person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result" and acts intentionally when it is "the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-211(a). A defendant commits an attempt to commit voluntary manslaughter when a defendant "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-12-101(a)(2).

The facts at trial, viewed in a light most favorable to the State, support the conclusion that Defendant intentionally or knowingly attempted to kill Mr. Lakin. The evidence showed that Mr. Trisler and Mr. Lakin followed Defendant to his home on their motorcycles. During the drive, the men yelled at each other several times. When Defendant got to his home, Defendant pulled into his driveway, exited his vehicle and entered his garage. Mr. Trisler and Mr. Lakin parked their motorcycles on the street. A few minutes later, Defendant exited the residence with at least one loaded pistol and intentionally fired the pistol multiple times at Mr. Lakin, striking him once in the hand and at least twice in the back. Defendant testified that the men shouted threats at him and his wife, pounded on his vehicle at a stop sign, and approached his property. The testimony of the victims and other witnesses conflicted with Defendant's version of the events. Mr. Mai testified that neither victim touched Defendant's car at the intersection. Mr. Jackson witnessed the men following each other on the road and saw Defendant fire at Mr. Lakin at Defendant's house. His description of the events leading up to the shooting in the recording of his 911 call and his testimony at trial indicated an escalation of emotional behavior by Defendant, including the use of aggressive driving and verbal assaults both by Defendant toward the victims and vice versa.

Defendant was indicted for attempted first degree murder. Defendant raised the affirmative defenses of self-defense and duress. A person may use deadly force in self-defense when that person has a reasonable belief, based upon reasonable grounds, that there is an imminent, real danger of death or serious bodily injury. T.C.A. § 39-11-

611(b)(2). "[W]hether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)). In convicting him of the lesser included offense, the jury obviously concluded that the victims' behavior provided adequate provocation for Defendant's actions, but that the severity of his response went beyond that necessary to defend himself and his wife. Moreover, he did not fire on the victims as a result of duress.

> Duress is a defense to prosecution where the person or a third person is threatened with harm that is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

T.C.A. § 39-11-504(a); *see also State v. Green*, 915 S.W.2d 827 (Tenn. 1995). There was no proof presented at trial that Defendant was under duress to shoot the victims. The assessment of the credibility of the witnesses is within the jury's prerogative. The evidence was sufficient to convict the defendant of attempt to commit voluntary manslaughter.

## B. Aggravated Assault

Likewise, we find the evidence sufficient to find Defendant guilty of aggravated assault of Mr. Lakin by "intentionally or knowingly commit[ting] an assault that involve[d] the use or display of a deadly weapon." T.C.A. § 39-13-102(a)(1)(A)(iii). An assault occurs when a defendant either "intentionally or knowingly causes another person to reasonably fear imminent bodily injury." T.C.A. § 39-13-101(a)(2). A firearm is a deadly weapon. T.C.A. § 39-11-106(a)(5)(A).

Mr. Trisler and Mr. Lakin followed Defendant to his home and parked their motorcycles in the street across from Defendant's home. Defendant entered his home and exited with at least one gun, pointing it at the victims. As Defendant continued to approach the victims, Mr. Lakin raised his arms in the air and tried to walk away. Although Defendant insisted that he acted in self-defense, the jury, by its verdict, did not find Defendant's testimony credible. Defendant is not entitled to relief.

## C. Reckless Aggravated Assault

Defendant was indicted for aggravated assault for using his SUV to knock Mr. Trisler and the motorcycle he was riding into a ditch. The indictment specified that Defendant "did unlawfully and knowingly cause [Mr.] Trisler to reasonably fear imminent bodily injury, while [Defendant] was using a deadly weapon, in violation of T.C.A. [§] 39-13-102." At the conclusion of the proof, the trial court charged the jury with aggravated assault and reckless aggravated assault as a lesser included offense.

After deliberating, the jury found Defendant guilty of the lesser included offense of reckless aggravated assault. A person commits reckless aggravated assault when he or she "[r]ecklessly commits an assault as defined in § 39-13-101(a)(1), and the assault: (i) [r]esults in serious bodily injury to another; or . . . (iii) [i]nvolved the use or display of a deadly weapon." T.C.A. § 39-13-102(a)(1)(B). Tennessee Code Annotated section 39-13-101(a)(1) defines assault as when a person "[i]ntentionally, knowingly or recklessly causes bodily injury to another."[8] The plain language defining the offense of reckless aggravated assault requires bodily injury. T.C.A. § 39-13-102(a)(1)(B); *State v. Goodwin*, 143 S.W.3d 771, 776 (Tenn. 2004). There was no proof at trial that Mr. Trisler suffered bodily injury as a result of Defendant's actions. The proof at trial showed that the victims followed Defendant on their motorcycles. At an intersection, Defendant put his SUV in reverse and backed up quickly one to two car lengths toward the victims. Mr. Trisler testified that the SUV "clipped [his] rear wheel" and "threw" him in the ditch. While it is plausible that Defendant's actions caused Mr. Trisler to reasonably fear imminent bodily injury, it is irrelevant because reckless aggravated assault requires more—it requires an injury. Mr. Trisler, when asked, testified he was not injured. Consequently, the evidence is insufficient to support Defendant's conviction for reckless aggravated assault. Moreover, in the manner that the State chose to indict, reckless aggravated assault cannot be a lesser included offense of aggravated assault based upon fearing imminent bodily injury because reckless aggravated assault requires actual bodily injury. *Goodwin*, 143 S.W.3d at 776. Accordingly, this conviction is reversed and dismissed.

## D. Leaving the Scene of an Accident

When a driver is involved in an accident "resulting in damage to a vehicle," they are required to "immediately stop the vehicle at the scene of the accident or as close to the scene as possible." T.C.A. § 55-10-102(a) (2013).[9] The trial court instructed the jury on necessity as an affirmative defense. Tennessee Code Annotated section 39-11-609

---

[8] The trial court erroneously instructed the jury that "[f]or you to find the defendant guilty of this offense, the state must prove beyond a reasonable doubt . . . that the defendant caused J.R. Trisler to reasonably fear imminent bodily injury; . . . [and] that the act involved the use or display of a deadly weapon, to wit: a motor vehicle."

[9] This statute was amended two months after Defendant's trial.

explains that for necessity to apply, a defendant must reasonably believe that his "conduct is immediately necessary to avoid imminent harm," and the "desirability and urgency of avoiding the harm clearly outweigh[s] the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness."

In this case, Defendant was stopped at a stop sign when he put his car in reverse, striking the motorcycle of one of the victims and forcing him off the road and into a ditch. The back rim of the motorcycle was bent, the headlight was cracked, and there were scratches on the bike. A bystander helped Mr. Trisler get his motorcycle back up onto the road. Defendant did not stop, leaving the scene almost immediately. The jury obviously discredited Defendant's claim of necessity and accredited the testimony of the victims and witness. The evidence supports the conviction.

## E. Public Intoxication

Finally, the evidence supports the public intoxication conviction. In order to sustain the conviction, the proof needed to show that Defendant was in a public place while under the influence of an intoxicating substance and posed a danger to others. T.C.A. § 39-17-310. A "public place" is a "place to which the public or a group of persons has access." T.C.A. § 39-11-106(a)(29).

At the time of the incident, Defendant was in the street outside his home. When Detective Rayda arrived on the scene, she could smell alcohol on his person, noticed his blood-shot eyes, and heard his slurred speech. Additionally, officers found a bottle of Fireball in Defendant's golf bag and the results from a toxicology test administered five hours after the incident showed a blood alcohol content of .04.

## Double Jeopardy

Citing *Duchac v. State*, 505 S.W.2d 237 (Tenn. 1973), and *State v. Hall*, 947 S.W.2d 181 (Tenn. Crim. App. 1997), Defendant argues that dual convictions for aggravated assault and attempted voluntary manslaughter violate double jeopardy because they are "the 'same' for double jeopardy purposes under our Constitution." The State disagrees, pointing out that Defendant relies on outdated law to support his argument.

The foundation for Defendant's argument arises in the Fifth Amendment to the United States Constitution which provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V. The Tennessee Constitution contains a similar provision in Article I, section 10, stating that "no person shall, for the same offence be twice put in jeopardy of life or limb." Courts have interpreted the Double Jeopardy Clause as providing three distinct protections: "(1)

- 14 -

protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012) (citations omitted). Whether multiple convictions violate the protection against double jeopardy is a mixed question of law and fact, which this Court will review de novo without any presumption of correctness. *State v. Smith*, 436 S.W.3d 751, 766 (Tenn. 2014) (citing *State v. Thompson*, 285 S.W.3d 840, 846 (Tenn. 2009)).

Defendant argues that he received multiple punishments for the same offense. However, the Tennessee Supreme Court has already determined that dual convictions for attempted voluntary manslaughter and aggravated assault do not violate double jeopardy. *State v. Feaster*, 466 S.W.3d 80, 87-88 (Tenn. 2015) (acknowledging the use of same-elements test established by the U.S. Supreme Court in *Blockburger v. United States*, 284 U.S. 299 (1932), to evaluate a double jeopardy claim by a defendant who has been convicted of multiple crimes under different statutes). Defendant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed in part, reversed in part, and remanded for entry of judgment forms dismissing Counts Four and Seven of the indictment.

_____
TIMOTHY L. EASTER, JUDGE